IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

Virginia Blankenship,                    :

            Plaintiff,                    :

      v.                                  :         Case No. 2:13-cv-483

                                          :

Commissioner of Social                              Magistrate Judge Kemp
Security,                                 :

            Defendant.                    :


OPINION AND ORDER

I.  Introduction

     Plaintiff, Virginia Blankenship, filed this action seeking
review of a decision of the Commissioner of Social Security
denying her application for disability insurance benefits.  That
application was filed on November 16, 2009, and alleged that
Plaintiff became disabled on June 1, 2007, which date was later
amended to June 24, 2009.

     After administrative denials of her claim, Plaintiff was
given a videoconference hearing before an Administrative Law
Judge on February 2, 2012.  In a decision dated April 11, 2012,
the ALJ denied benefits.  That became the Commissioner's final
decision on April 3, 2013, when the Appeals Council denied
review.

     After Plaintiff filed this case, the Commissioner filed the
certified administrative record on September 20, 2013.  Plaintiff
filed her statement of specific errors on December 19, 2013.  The
Commissioner filed a response on March 31, 2014.  No reply brief
has been filed, and the case is now ready to decide.

II.  Plaintiff's Testimony at the Administrative Hearing

     Plaintiff, who was 50 years old at the time of the
administrative hearings and left school before completing the
sixth grade, testified as follows.  Her testimony appears at

pages 561-93 of the administrative record.

Plaintiff testified that she was unable to read or write. She also could not add or subtract. She lived in a home with stairs but climbing them was difficult due to issues with her back, legs, and breathing. She had not driven in the past year due to problems turning her neck.

Plaintiff had last worked at a Cracker Barrel restaurant, a job she held for about six years. She was a dishwasher. While working at Cracker Barrel, she hurt her right hand and received workers' compensation benefits for the injury. She attempted to work in 2008 through two temporary services agencies but was unsuccessful. One would not give her work assignments because of her illiteracy, and the other assigned her to a job but she lasted only a week.

As to her physical symptoms, Plaintiff described pain in her legs and a tingling or burning sensation in her toes. The bones rub together in her knees, and her right hand is still painful at times. She occasionally drops items she has picked up with that hand. She could not lift her left arm completely over her head and, as she had previously said, had problems turning her head side to side. She could walk for five or ten minutes at a time and could stand for half an hour. She could sit for less than half an hour and was constantly shifting positions.

Plaintiff also testified that she took insulin for diabetes but still had high blood sugar. She also was receiving psychological counseling, and reported staying in her room for long periods of time and hearing voices or sounds like moving furniture. She did have a friend she spent time with and went out with occasionally. She did not believe she could go shopping independently. She also had back pain which radiated into her left leg. It caused her to have a bad day every week or two. Plaintiff had very occasional chest pain (every three or four

-2-

months) which she attributed to her prior heart attack.

In response to further questioning by the ALJ, Plaintiff said that she attempted to help with household chores and that she had stopped doing the shopping because she "got tired of going." She was able to dress and bathe herself. On a typical day, she watched television. Two or three times a week she would leave her house to go to physical therapy or to go out with friends. She could lift five or ten pounds and carry that amount of weight a short distance.

### III. The Medical Records

The pertinent medical records can be summarized as follows. The Court will provide page references for these records as they are summarized, and will discuss only those records which either the parties, in their memoranda, or the ALJ considered to be important to the decision in this case.

### A. Physical Impairments

As far as Plaintiff's physical impairments are concerned, Plaintiff points first to records from the treating source, Dr. Koehler (mistakenly referred to by the ALJ as Dr. Raymond Fuller - Dr. Fuller was the surgeon who treated Plaintiff's breast cancer) dated in early 2009. Those records show that Plaintiff reported pain in her right leg and hip in February, 2009 (Tr. 1408) and that Dr. Koehler prescribed Neurontin. She had complained of right foot and leg pain two weeks before (Tr. 1410). She still had right leg pain on May 7, 2009, and also exhibited pain on flexion of the right hip. (Tr. 1414-15). In between those two visits she reported back pain. (Tr. 1418). At some point, Dr. Koehler concluded that Plaintiff's right knee pain was due to neuropathy. (Tr. 1421). Dr. Koehler then filled out a residual functional capacity form on January 15, 2010 indicating that Plaintiff could not lift any weight, could stand or walk for a total of four hours in a work day but only for half

-3-

an hour at a time, could sit for four hours but only two hours at a time, could rarely or never engage in any postural activities except feeling or fine manipulation, had a large number of environmental restrictions, needed a cane, and required a sit/stand option. (Tr. 1402-03).

Next, Plaintiff cites to records showing that in January, 2010, she complained to Dr. Triffon of left shoulder pain. Studies showed a type 2 to 3 acromion, rotator cuff tendinopathy without evidence of a tear, and mild arthritis. Her shoulder was injected and physical therapy was recommended. (Tr. 1775). The next month she was seen at the Orthopaedic & Spine Center for evaluation of her left arm pain. Her shoulder was tender to the touch. She also reported constant low back pain. At that time, she was taking no pain medication and her neck was supple and non-tender. The active range of motion of her left shoulder was within normal limits. Pain management was discussed. (Tr. 1825-27). An MRI of the cervical spine, performed in February, 2010, showed moderate multilevel degenerative disc disease and congenital narrowing of the central spinal canal, as well as some foraminal stenosis at C5-C6. (Tr. 1833-35). An MRI of the left shoulder done on March 16, 2010 ruled out a rotator cuff tear but did show some mild abnormalities. (Tr. 1828-29). She had shoulder surgery (described as an arthroscopic capsular release) on April 22, 2010, as well as manipulation under anesthesia. (Tr. 1802-03). During subsequent physical therapy, Plaintiff said at one time that the pain "never stops," but she was showing an increase in her range of motion. (Tr. 1880). Her therapy was discontinued in early June due to pain. (Tr. 1932). When she saw the surgeon on July 2, 2010, she was continuing to struggle with pain and motion but she was "doing okay." (Tr. 1900). A month later, she received an injection of lidocaine, Marcaine, and Kenalog; Dr. Latshaw commented that she was not doing as well

-4-

as he had hoped.  (Tr. 1934).  She had pain over the AC joint
when he saw her next.  (Tr. 1935).

Plaintiff was seen by Dr. Gould for chest wall and shoulder
pain on November 22, 2010.  She was somewhat anxious and confused
during the examination.  His impressions included left shoulder
pain with osteoarthritis and rotator cuff and he prescribed
Lidoderm for painful sites on her skin.  He also recommended left
intercostal blocks for the chest wall pain and discussed possible
medications.  A month later, Dr. Gould noted that the intercostal
blocks provided only minimal relief, and that Plaintiff was now
reporting low back pain.  She appeared to be in a mild to
moderate level of distress.  Dr. Gould increased her pain
medications (gabapentin and Dilaudid) and he also considered
treatment options for her back pain.  (Tr. 1980-83).  During that
same time frame (November, 2010), Plaintiff was seen at the Grady
Memorial Hospital emergency room for back pain.  A complete
neurological examination could not be done at that time due to
her discomfort level.  The diagnosis at that time was an
exacerbation of sciatica, and Plaintiff was discharged with pain
medication.  (Tr. 1948-50).  That took place before she saw Dr.
Gould.  When Dr. Gould saw her again in early 2011, he noted that
right-sided facet injections had been tried and provided some
relief for three or four days, and that the hydromorphone he had
prescribed was making her nauseous.  He prescribed oxycodone.
(Tr. 2053).  Dr. Gould was still treating Plaintiff's low back
pain in 2011, with about the same amount of success.  See, e.g.,
Tr. 2124.

The Commissioner notes that other records also shed light on
Plaintiff's physical impairments.  Dr. Caldwell, a state agency
physician, reviewed certain medical records and completed a
physical residual functional capacity assessment form on March
31, 2010.  She concluded that Plaintiff could do light work,

although she could never balance and could do other postural activities only occasionally. Dr. Caldwell limited Plaintiff to no reaching overhead with her left arm and to frequent but not constant bilateral handling and fingering. She commented that any issues Plaintiff was having with her back, knee, leg, shoulder, hand or foot were occasional and resolved after developing. The restriction on left overhead lifting was due to the mastectomy and not to any orthopedic issue involving the shoulder itself. Dr. Caldwell rejected Dr. Koehler's evaluation because it was not supported by the objective evidence. (Tr. 1781-88). The Commissioner also points out that the records cited by Plaintiff relating to her progress after shoulder surgery showed continuous improvement in both her passive and active ranges of motion. Additionally, the Commissioner notes (and Plaintiff concedes) that the records show an almost nine-month gap (from March through November of 2010) in any treatment for Plaintiff's back condition.

      B.  <u>Psychological Impairments</u>

     The first psychological exhibit to which Plaintiff refers is an evaluation done by Dr. Heintzelman dated March 15, 2010. That report notes that Plaintiff was a self-referral for psychiatric treatment in 2009, when she said she was spending almost every hour of every day in her room. Dr. Heintzelman described her as not being "an entirely reliable historian." She reported mood disturbances for the past two years as well as delusional behavior and auditory hallucinations. Plaintiff was observed to be anxious, dysphoric, tearful, and in physical pain. She was diagnosed with major depressive disorder, recurrent with psychotic features and a mood disorder and her GAF was rated at 45. She was begun on a trial of Seroquel and Wellbutrin and was instructed to follow up with appointments both with a nurse and with Dr. Heintzelman. (Tr. 1858-60). Within two weeks,

-6-

Plaintiff reported feeling better and her affect was brighter and less anxious. (Tr. 1866). Within three months, she was reporting an excellent response to medication and was "[d]oing very well." (Tr. 1928).

Next, Plaintiff recapped a report prepared by Dr. Tanley, a consultative examiner. He examined her on April 29, 2010, which was about six weeks after she started on the medications prescribed by Dr. Heintzelman. At that time, she alleged mood problems but had an appropriate affect and her recent and remote memory were intact. Her level of intellectual functioning appeared "no higher than Borderline." She was cordial and made an effort to complete all tasks given her, and she could understand and remember simple instructions. Dr. Tanley concluded that Plaintiff had mild impairments in the areas of following instructions and maintaining attention to perform simple, repetitive tasks, and that she had a marked impairment in the area of withstanding the pressure of everyday work, which Dr. Tanley attributed to her appetite and sleep disturbances, mood problems, diminished energy, and cognitive insufficiency. He rated her GAF at 50. (Tr. 1820-22).

Plaintiff also relies on several functional assessments done by Dr. Koehler, who, although not a specialist in the area, had provided treatment and who thought she was severely limited in various areas relating to the ability to perform work-related functions from a psychological standpoint. See Tr. 1526-27, 2182-83. She also refers to one of his treatment notes (Tr. 2082) in which Plaintiff reported being out of medication. At that time, she was anxious and scratching at her skin, but was not depressed, hypomanic, delusional, paranoid, suicidal, or homicidal, and she was "alert, oriented, cooperative and responsive" and her "memory was intact for recent events and judgment is adequate."

The Commissioner, in turn, has directed the Court's attention to, first, another of Dr. Heintzelman's notes, this one from May 24, 2010, where Plaintiff is described as stable, medication compliant, and calm and relaxed (at least in the waiting room). She started to scratch herself once she saw Dr. Heintzelman, claiming that she had developed that problem since she stopped taking Xanax, but she stopped scratching as soon as Dr. Heintzelman pointed out her behavior. (Tr. 1925)

Next, the Commissioner highlights the evaluation done by Dr. Goldsmith, a state agency psychologist, to which the ALJ gave considerable weight. Dr. Goldsmith thought that Plaintiff's impairments included a mood disorder and borderline intellectual functioning. He concluded, in a report dated May 17, 2010, that these impairments moderately limited Plaintiff in the areas of activities of daily living and maintaining concentration, persistence, and pace; more specifically, she had moderate limitations in her ability to understand, remember, and carry out detailed instructions, to maintain attention and concentration for extended periods, to complete a workday or workweek without interruption from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods, and to respond appropriately to changes in the work setting. Dr. Goldsmith rejected Dr. Tanley's conclusion about a marked impairment in the ability to withstand work stress, stating that it was not supported by the evidence, and noting that "Clmt has not been in treatment for a mental disorder and has never decompensatted (sic). Moderate impairment is accepted." He limited her to simple, routine tasks without strict time or production demands. (Tr. 1839-55).

IV. The Vocational Testimony

Dr. Crunk, a vocational expert, also testified at the administrative hearing. His testimony begins at page 893 of the

-8-

record.

He began by classifying Plaintiff's past work.  Her job as a dishwasher was unskilled and medium.  That was the only prior work about which he was asked.

Dr. Crunk was asked some questions about a hypothetical person who was 47 to 49 years of age, was illiterate, and had relevant past work as a dishwasher.  That person was limited to work at the light exertional level except that she could lift and carry 15 pounds frequently and 30 pounds occasionally, could not climb ladders, ropes, or scaffolds, could occasionally climb ramps and stairs, could occasionally stoop, kneel, crouch, and crawl, could frequently handle and finger bilaterally, and could occasionally reach overhead with the left arm.  Also, the person could perform only simple, routine, repetitive tasks in a low-stress environment, which was defined as one without fast-paced production or strict time quotas and with no more than occasional changes in tasks.  The person would also need to have tasks explained or demonstrated.  Dr. Crunk testified that those limitations would rule out Plaintiff's past work.  However, such a person could perform jobs like laundry worker, sorter, and packer.  Dr. Crunk also gave numbers for those jobs in both the regional and national economies.

Next, Dr. Crunk was asked to assume that the hypothetical person could not lift or carry any weight, could sit, stand or walk for four hours, could not perform postural activities, could occasionally feel or do fine manipulation, could never reach, handle, push, pull, or do gross manipulation, and could not work around dangerous moving machinery or extreme temperature changes, chemicals, dust, noise or fumes.  Such a  person could not, in Dr. Crunk's view, be employed.  The same would be true for a person who could not sit, stand, or walk for any amount of time during a work day.

Plaintiff's counsel asked additional questions, in response

-9-

to which Dr. Crunk testified that if a person needed a sit/stand
option which interfered with the persistence and pace of the
work, she was not employable.  The same would be true for someone
who would be absent two or more days each month, or who would be
off task fifteen percent of the time in an unskilled work
setting.

V.   The Administrative Law Judge's Decision

     The Administrative Law Judge's decision appears at pages
110-122 of the administrative record.  The important findings in
that decision are as follows.

     The Administrative Law Judge found, first, that Plaintiff
met the insured requirements of the Social Security Act through
December 31, 2010, and that she had not worked since June 24,
2009, her alleged onset date.  As far as Plaintiff's impairments
are concerned, the ALJ found that Plaintiff suffered from
cervical degenerative disc disease with stenosis, lumbar
degenerative disc disease with spondylosis and radiculopathy,
status post left breast mastectomy and removal of mass, status
post left shoulder surgery, borderline intellectual functioning,
and major depressive disorder.  The ALJ also found that these
impairments did not, at any time, meet or equal the requirements
of any section of the Listing of Impairments (20 C.F.R. Part 404,
Subpart P, Appendix 1).

     The ALJ next concluded that Plaintiff had the residual
functional capacity to perform work at the light exertional
level, except that she could lift and carry 15 pounds frequently
and 30 pounds occasionally, could not climb ladders, ropes, or
scaffolds, could occasionally climb ramps and stairs, could
occasionally stoop, kneel, crouch, and crawl, could frequently
handle and finger bilaterally, could occasionally reach overhead
with the left arm, and could perform only simple, routine,
repetitive tasks (no more than Specific Vocational Preparation
(SVP) 2-type tasks) in an environment without fast-paced

-10-

production or strict time quotas and with no more than occasional changes in tasks.  She would also need to have tasks explained or demonstrated.

Last, the ALJ found that, with these restrictions, Plaintiff could not do her past relevant work, but she could perform the jobs identified by the vocational expert (laundry worker, sorter, and packer) and that such jobs existed in significant numbers in the regional and national economies.  Consequently, the ALJ concluded that Plaintiff was not entitled to benefits.

VI.  <u>Plaintiff's Statement of Specific Errors</u>

In her statement of specific errors, Plaintiff raises two issues.  She argues that (1) the ALJ did not properly assess her testimony concerning pain, and (2) that the ALJ's residual functional capacity finding is not supported by substantial evidence.  The Court analyzes these arguments under the following standard.

<u>Standard of Review.</u>  Under the provisions of 42 U.S.C. Section 405(g), "[t]he findings of the Secretary [now the Commissioner] as to any fact, if supported by substantial evidence, shall be conclusive. . . ."  Substantial evidence is "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion'" <u>Richardson v. Perales</u>, 402 U.S. 389, 401 (1971) (quoting <u>Consolidated Edison Company v. NLRB</u>, 305 U.S. 197, 229 (1938)).  It is "'more than a mere scintilla.'" <u>Id</u>.  <u>LeMaster v. Weinberger</u>, 533 F.2d 337, 339 (6th Cir. 1976).  The Commissioner's findings of fact must be based upon the record as a whole.  <u>Harris v. Heckler</u>, 756 F.2d 431, 435 (6th Cir. 1985); <u>Houston v. Secretary</u>, 736 F.2d 365, 366 (6th Cir. 1984); <u>Fraley v. Secretary</u>, 733 F.2d 437, 439-440 (6th Cir. 1984).  In determining whether the Commissioner's decision is supported by substantial evidence, the Court must "'take into account whatever in the record fairly detracts from its weight.'" <u>Beavers v. Secretary of Health, Education and Welfare</u>, 577 F.2d

383, 387 (6th Cir. 1978) (quoting <u>Universal Camera Corp. v. NLRB</u>, 340 U.S. 474, 488 (1951)); <u>Wages v. Secretary of Health and Human Services</u>, 755 F.2d 495, 497 (6th Cir. 1985).  Even if this Court would reach contrary conclusions of fact, the Commissioner's decision must be affirmed so long as that determination is supported by substantial evidence.  <u>Kinsella v. Schweiker</u>, 708 F.2d 1058, 1059 (6th Cir. 1983).

    A.  <u>Evaluation of Plaintiff's Pain</u>

    Plaintiff notes that in <u>Duncan v. Sec'y of HHS, 801 F.2d 847</u> (6th Cir. 1986), the Court of Appeals articulated the now-familiar two-part test for evaluating a claimant's assertion of disabling pain: is there objective medical evidence of a condition which could cause such pain, and, if so, are the claimant's allegations reasonable in light of that evidence?  This test now appears in 20 C.F.R. §404.1529(a).  She then argues that there is abundant objective evidence of conditions which can cause disabling pain, including degenerative disc disease and degeneration of the shoulder joint, and that the record shows she consistently reported low back pain, pain in her legs, shoulder, and right hand, use of a cane, and that she underwent repeated treatments for that pain.  She criticizes the ALJ's evaluation of the evidence, claiming that he disregarded her testimony about the limitations caused by her pain; that her activities of daily living, cited by the ALJ as evidence that her testimony was not credible, are actually consistent with someone suffering from disabling pain; and that the long gap in treatment for her back condition is not evidence that the condition was not disabling.  She contends that the ALJ did not follow the requirements of <u>Felisky v. Bowen</u>, 35 F.3d 1027 (6th Cir. 1994), and that "substantial evidence exists to support a finding of disability based on a less than sedentary residual functional capacity."  Statement of Errors, Doc. 19, at 10.

    This latter claim does not provide any basis for reversal or

-12-

remand.  "The findings of the Commissioner are not subject to
reversal merely because there exists in the record substantial
evidence to support a different conclusion." Buxton v. Halter,
246 F.3d 762, 772 (6th Cir. 2001).  Rather, the issue is whether
the Commissioner's findings are reasonably supported by the
record, even if the same record might also support a different
conclusion on the issue of disability.

        Turning to the remainder of Plaintiff's argument on this
issue, it is correct that the Commissioner is not permitted to
reject allegations of disabling symptoms, including pain, solely
because objective medical evidence is lacking, but must consider
other evidence, including the claimant's daily activities, the
duration, frequency, and intensity of the symptoms, precipitating
and aggravating factors, medication (including side effects),
treatment or therapy, and any other pertinent factors.  20 C.F.R.
§404.1529(c)(3); Felisky, supra.  If the Commissioner summarily
rejects the claimant's testimony concerning pain without
considering these matters, reversal or remand may be warranted.
However, it is important to keep in mind that "[i]t is for the
Secretary, not a reviewing court, to make credibility findings."
Felisky, 35 F.3d at 1036.

        The ALJ correctly recited the legal standard to be applied.
See Tr. 116.  He then reviewed her testimony concerning her back
and neck pain, problems with her left shoulder and arm, and
difficulty turning her head from side to side, and noted what she
said about functional limitations.  (Tr. 116-17).  He also
recounted her daily activities as she identified them.  (Tr.
117).  After doing so, he pointed out that although she continued
to have shoulder pain, her range of motion had steadily
increased, and that she did not seek treatment for back pain from
February through November of 2010.  He specifically referred to
404.1529(c), as well as Social Security Ruling 96-7p, in his
decision, stating that he considered the factors listed in those

                              -13-

sources but concluding that "the claimant's allegations of
disabling symptoms and limitations cannot be accepted ...."  (Tr.
119).  Finally, he stated that "the scope of claimant's daily
activities weakens the credibility of her allegations," noting
the inconsistencies between some of her claims of psychological
impairment, such as being unable to concentrate or to leave her
room, and her ability to follow television shows and go shopping
with friends.  Id.

The ALJ did refer to the regulation and ruling which list
out the credibility factors noted by the Felisky court, but his
decision does not go through an extensive analysis of each one.
However, that is not required.  As the Commissioner argues, the
case law requires that an ALJ's decision be reviewed "as a
whole," see Malone v. Comm'r of Social Security, 2011 WL 5520292,
*2 (N.D. Ohio Nov. 10, 2011).  Malone, in turn, quoted this
language from Kornecky v. Comm'r of Social Security, 167 Fed.
Appx. 496, 508 (6th Cir. Feb. 9, 2006)(quoting Loral Defense
Systems-Akron v. NLRB, 200 F.3d 436, 453 (6th Cir. 1999)):

> An ALJ can consider all the evidence without directly
> addressing in his written decision every piece of
> evidence submitted by a party.  Nor must an ALJ make
> explicit credibility findings as to each bit of
> conflicting testimony, so long as his factual findings
> as a whole show that he implicitly resolved such
> conflicts.

Judged by that standard, the ALJ provided a sufficient
explanation of why he found Plaintiff not entirely credible.

Beyond that, the question remains as to whether substantial
evidence supports that credibility finding.  There were, in this
case, some conflicts between the symptoms reported by Plaintiff
to various treating sources, an indication in the medical records
that a number of her more serious complaints (although certainly
not all of them, especially her shoulder issues) were either

-14-

intermittent or resolved with treatment - something Dr. Caldwell
pointed out - and some inconsistencies in her behavior.  There is
also the observation made by Dr. Heintzelman about the difference
between her behavior in the waiting room and when he conducted
his interview, a statement from Dr. Heintzelman that she was not
a very good historian, and some indication of discrepancies in
her medication history.  All of those factors are enough to have
allowed the ALJ to discount Plaintiff's testimony to some degree.
The Court finds no error in that aspect of the decision, and
turns to the second question, which is whether substantial
evidence supports the ALJ's residual functional capacity finding.

     B.  <u>The Residual Functional Capacity Finding</u>

Plaintiff divides her argument on this issue into two parts.
First, she takes issue with the finding that she could, from a
physical standpoint, perform a reduced range of light work up to
December 31, 2010.  Second, she argues that the ALJ improperly
disregarded evidence that she could not withstand the stress and
pressure of everyday work activity.  The Court will address each
argument in turn.

     1.  <u>Physical Capability to Do Light Work</u>

The primary contention Plaintiff raises about the finding
that she could do light work is that, due to her shoulder and
back conditions, she could not lift up to thirty pounds
occasionally during a work day.  In addition to citing the
medical evidence summarized above about the treatment she
received for these conditions and her testimony about how limited
she is, she asserts that the ALJ was not entitled to rely on Dr.
Caldwell's opinions - both her initial review and a subsequent
analysis done on May 18, 2010, <u>see</u> Tr. 1857 - because those
reviews predated much of her shoulder treatment.

It is true that Dr. Caldwell's limitations on above-
shoulder-level lifting were initially based on the after-effects
of Plaintiff's mastectomy rather than the shoulder problem she

-15-

began receiving treatment for in January, 2010.  By the time she
rendered her second opinion, she was aware of the March, 2010
tests and diagnoses.  In addition, Dr. Bolz, another state agency
reviewer, completed a case analysis form on September 23, 2010,
and explicitly mentioned the shoulder surgery from April, 2010
and the physical therapy notes showing progression of range of
motion and continued pain.  He noted that Dr. Caldwell had
imposed limitations on the left shoulder and he affirmed her
assessment as written.  (Tr. 1937).  Under these circumstances,
the ALJ did not commit the error alleged by Plaintiff by relying
on Dr. Caldwell's opinion; that opinion was confirmed on
September 23, 2010 after most of the records cited by Plaintiff
had been reviewed by a state agency physician, and Plaintiff has
not demonstrated that any subsequent records of either her
shoulder or her back treatment prior to December 31, 2010 would
have affected those opinions.  See, e.g., Chandler v. Comm'r of
Social Security, 667 F.3d 356, 361 (3d Cir. 2011)(noting that
there is always a time lapse between a state agency review and
the ALJ decision and that the applicable ruling, SSR 96-6p,
requires such reviews to be updated only when the ALJ concludes
that new medical evidence might change the state agency
physician's findings); see also McGrew v. Comm'r of Social
Security, 343 Fed. Appx. 26, 32 (6th Cir. Aug. 19,
2009)(rejecting argument that ALJ improperly relied on outdated
state agency physicians' opinions because it was "clear from the
ALJ's decision, however, that he considered the medical
examinations that occurred after" the date of those opinions);
Grider v. Comm'r of Social Security, 2011 WL 1114314, *5-6 (S.D.
Ohio March 25, 2011)(same).

2.  Mental Capacity to Withstand Stress

Plaintiff's final argument is that the ALJ erred in the way
he assessed her mental impairment.  More specifically, she
asserts that the ALJ failed "to take into account her

-16-

longstanding issues with depression and the opinions of her treating physician, Dr. Koehler and the consultative examiner, Dr. Tanley." See Doc. 19, at 17.  She contends that the ALJ should not have discounted Dr. Koehler's opinions on psychological limitations just because he is not a mental health specialist, and that the restriction he imposed (working in a low stress environment) did not factor in Dr. Tanley's view that Plaintiff had a marked impairment in this area.

Taking these arguments in reverse order, although Dr. Tanley concluded that Plaintiff had a marked impairment in her ability to withstand ordinary work stress, the ALJ did not accept that conclusion, and Plaintiff has provided no basis for concluding that he was required to do so.  The ALJ placed greater weight on the opinion of Dr. Goldsmith, noting that he gave Dr. Tanley's views only "some weight" and gave Dr. Goldsmith's somewhat conflicting opinion "great weight."  (Tr. 120).  It is up to the ALJ to choose among competing medical opinions, and so long as the ones he chooses are supported by substantial evidence in the record, the Court cannot disturb that choice.  When an ALJ has "specifically cited the major pieces of medical evidence, assigned weight to each report based upon the consistency of its findings with the medical record as a whole, explained his reasons for rejecting the contrary medical evidence, and [has drawn] his conclusion on the basis of the relevant evidence," his conclusions are not subject to reversal by the reviewing court. See Mitchell v. Comm'r of Social Security, 330 Fed.Appx. 563, 568 (6th Cir. June 2, 2009).

The remaining argument relates to Dr. Koehler's opinion about Plaintiff's psychological limitations.  He expressed his opinion on two occasions; the second time was a year after the Plaintiff's insured status expired and is not particularly relevant, although it is also substantially the same as his earlier opinion.  Essentially, Dr. Koehler said that Plaintiff

-17-

had a poor ability to perform almost all of the functions of work (he rated her ability to do a small number of functions as fair, and gave her only one "good" rating - the ability to maintain her appearance) - ratings clearly inconsistent with the performance of any gainful employment.  He attributed all of these symptoms to her depression.  (Tr. 1526-27).

Plaintiff does not specifically argue that these views should have been accorded controlling weight because Dr. Koehler was a treating source.  She claims, however, that due to that status, his opinion should have been given more thorough consideration by the ALJ and not subjected to the "dismissive statement" that because he was not a mental health provider, or even Plaintiff's primary mental health treater, his opinion was due little deference.

The ALJ did not spend a great deal of time discussing Dr. Koehler's views about Plaintiff's psychological limitations, noting that his extreme conclusions concerning both mental and physical limitations were apparently stated as part of an effort to obtain benefits for Plaintiff and that some of them were outside of his area of expertise.  (Tr. 120).  The ALJ did, however, review extensively both Dr. Tanley's and Dr. Goldsmith's opinions, and also cited Dr. Heintzelman's notes showing that Plaintiff's condition improved dramatically when she began taking medications.  Clearly, Dr. Tanley, who saw only mild restrictions in most of the work-related areas he evaluated, disagreed substantially with Dr. Koehler; the only area they agreed on related to Plaintiff's ability to deal with work stress.  Dr. Goldsmith, in turn, found Plaintiff to be more restricted in some areas than did Dr. Tanley, but he thought Dr. Tanley's conclusion about work stress was not supported by the record.  Plaintiff has pointed to no specific treatment notes which might support such an extreme limitation.  Again, when faced with conflicting views from various sources, the ALJ was allowed to factor in Dr.

-18-

Koehler's lack of expertise and to choose between Dr. Tanley's and Dr. Goldsmith's opinions as long as there was substantial support in the record for the conclusion he ultimately reached. See, e.g., 20 C.F.R. 404.1527(c)(5) ("We generally give more weight to the opinion of a specialist about medical issues related to his or her area of specialty than to the opinion of a source who is not a specialist"); see also Griffin v. Astrue, 2009 WL 633043, *9 (S.D. Ohio March 6, 2009).  For these reasons, the Court sees no error in the way that the ALJ assessed Plaintiff's mental residual functional capacity.

## VII.  Decision

Based on the above discussion, Plaintiff's statement of errors is overruled and the Clerk is directed to enter judgment in favor of the Defendant Commissioner of Social Security.


/s/ Terence P. Kemp
United States Magistrate Judge